**17-3258(L)**
*In re 650 Fifth Ave. & Related Props.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term 2018

(Argued: May 1, 2019 | Decided: August 9, 2019)

Docket No. 17-3258(L)

IN RE: 650 FIFTH AVENUE AND RELATED PROPERTIES[*]

————————

Before:

PARKER, WESLEY, and CHIN, *Circuit Judges.*

This is a civil action brought by the United States of America seeking forfeiture of property owned by the Claimants Alavi Foundation and 650 Fifth Avenue Company. In 2016, we reversed an order of the United States District Court for the Southern District of New York (Forrest, *J.*) granting summary judgment to the Government and remanded for the court to address certain open matters. On remand, the district court denied the Claimants' motion to compel discovery on their statute-of-limitations defense, granted summary judgment to the Government on the merits of the timeliness issue, and denied the Claimants' motion to suppress evidence seized pursuant to a defective search warrant. At the jury trial that followed, the court prohibited the Claimants from calling two former Alavi board members to testify, allowed the Government to play videotaped depositions of five former board members repeatedly invoking their Fifth Amendment privilege, and barred the Claimants from arguing that the Government improperly intimidated these witnesses. The court also ruled in favor of the Government on dozens of other challenged orders during its adjudication of the case. The jury ultimately found for the Government, and the court entered judgment ordering the forfeiture of the Claimants' property.

————————

[*] The Clerk of the Court is directed to amend the official caption as set forth above.

We hold that the district court abused its discretion by denying the Claimants' motion for discovery on their statute-of-limitations defense and, accordingly, erroneously granted the Government's motion for summary judgment on the timeliness issue. We **REVERSE** the court's discovery order, **VACATE** the summary judgment order, and **REMAND** for discovery.

We also hold that the district court erroneously denied the Claimants' motion to suppress by incorrectly concluding that the exclusionary rule's good-faith exception forgave the warrant's defects and by applying the wrong legal standard for the inevitable-discovery exception. We **REVERSE** the portion of the suppression order concerning the good-faith exception and **VACATE** and **REMAND** on inevitable discovery for the court to apply the correct standard.

In addition, we find that the district court abused its discretion in its orders forbidding the former Alavi board members from testifying at trial, allowing the Government to play the videotaped Fifth Amendment invocations, and prohibiting the Claimants from mounting their preferred defense. We **REVERSE** in part and **VACATE** in part the orders underlying these decisions.

In light of these holdings, we **VACATE** the judgment and **REMAND** for further proceedings consistent with this opinion.

————————————

DANIEL S. RUZUMNA, Patterson Belknap Webb & Tyler LLP, New York, NY; JOHN GLEESON, Debevoise & Plimpton LLP, New York, NY (Melissa Ginsberg, Michael N. Fresco, Patterson Belknap Webb & Tyler LLP, New York, NY; Matthew E. Fishbein, Derek Wikstrom, Justin R. Horton, Debevoise & Plimpton LLP, New York, NY, *on the brief*), *for* Claimants-Appellants Alavi Foundation and 650 Fifth Avenue Company.

MICHAEL D. LOCKARD, Assistant United States Attorney (Daniel M. Tracer, Daniel B. Tehrani, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

————————————

WESLEY, *Circuit Judge*:

This civil-forfeiture action considers whether the Government may seize 650 Fifth Avenue, a skyscraper in Midtown Manhattan, along with other real property and various bank accounts located throughout the United States. These assets are owned by the Alavi Foundation and 650 Fifth Avenue Company (the "Claimants"), entities that allegedly violated federal law through their relationships with the Islamic Republic of Iran. After a month-long trial, a jury ruled largely in favor of the Government, and the United States District Court for the Southern District of New York (Forrest, *J.*) entered judgment for the Government and ordered forfeiture of the assets. The Claimants appeal from that judgment and challenge over a dozen pretrial, trial, and posttrial orders.

The district court committed numerous errors requiring us to reverse or vacate several of these orders. These errors also require us to vacate the judgment.

*First*, the district court abused its discretion by denying the Claimants' motion to compel discovery of evidence they contend supports their theory that this action was untimely under the governing statute of limitations, 19 U.S.C. § 1621. We reverse the underlying order and remand for discovery. We also vacate the grant of summary judgment to the Government on the timeliness issue.

3

*Second*, the district court erred in denying the Claimants' motion to suppress evidence obtained pursuant to a defective search warrant. We reverse the court's suppression order to the extent it applied the good-faith exception to the Fourth Amendment's exclusionary rule. The Government's failure to identify the warrant's glaring defects, or its decision to execute the warrant in spite of them, precludes a finding of good faith. As to its application of the inevitable-discovery exception, the court failed to follow the legal standard laid out in our prior decision. We vacate its order with respect to this exception and remand for the court to apply the correct legal standard.

*Third*, the district court abused its discretion by barring two former Alavi board members from testifying at trial. We reverse the underlying order. The court also abused its discretion by allowing the Government to play at trial five videotapes of former board members repeatedly invoking their Fifth Amendment privilege against self-incrimination. We vacate the underlying orders. Lastly, the court abused its discretion by precluding the Claimants from presenting certain rebuttal evidence. We vacate the underlying orders.

4

## BACKGROUND[1]

### A. The Claimants

Alavi is a New York not-for-profit corporation created in 1973 by Mohammad Reza Pahlavi, then Shah of Iran.[2] The Internal Revenue Service ("IRS") has classified Alavi as a charitable organization under § 501(c)(3) of the Internal Revenue Code.

In 1974, Alavi acquired property located at 650 Fifth Avenue, New York, New York. One year later, it borrowed $42 million from Bank Melli, owned by the Government of Iran, to retire mortgages on the property and construct a 36-story skyscraper featuring retail and office space (the "Building"). For various reasons, Alavi ran into financial trouble in the 1980s.

Assa Corporation ("Assa Corp."), which was a party below but is not a party to this appeal, is a New York corporation formed in 1989. It is wholly owned by Assa Company Limited ("Assa Ltd.," and collectively with Assa Corp., "Assa"), a

---

[1] In 2016, we vacated the district court's order granting summary judgment to the Government in this action. *See In re 650 Fifth Ave. & Related Props.*, 830 F.3d 66 (2d Cir. 2016). A more complete version of the facts giving rise to this litigation is found in that opinion.

[2] Alavi was originally known as the Pahlavi Foundation and later as the Mostazafan Foundation of New York. We refer to all iterations of the entity as Alavi.

corporation formed in Jersey, Channel Islands. In 1993, Bank Melli acquired a holding company that had come to own Assa. Two years later, Bank Melli transferred the holding company to private individuals. Despite this transfer, the Claimants agree that Bank Melli continued to control Assa after 1995, the year the relevant economic sanctions against Iran took effect.[3] Whether Alavi knew this fact is a disputed question at the center of this lawsuit.

In 1989, Alavi entered into a partnership agreement with Assa to form 650 Fifth Ave. Co. under New York law. After receiving authorization from the Charities Bureau of the New York Attorney General's Office and the New York Supreme Court, Alavi transferred the Building, valued at $83.2 million at the time but subject to the Bank Melli mortgage, to the partnership. Assa contributed $44.8 million, which 650 Fifth Ave. Co. used to pay off the Bank Melli mortgage. Ultimately, Alavi owned 60% of 650 Fifth Ave. Co. and Assa owned 40%.[4] 650 Fifth Ave. Co. owned 100% of the Building.

---

[3] While the Claimants conceded this fact below, Assa disputes this post-1995 control finding. We address the merits of Assa's challenge in a companion opinion.

[4] Alavi initially owned 65% of 650 Fifth Ave. Co. and Assa owned 35%, but Alavi subsequently sold a 5% stake in the partnership to Assa.

Today, Alavi is the managing partner of 650 Fifth Ave. Co. The partnership has no employees, and its primary operational activity is engaging outside companies to manage the Building.

### B. Pleadings, Early Developments, and Summary Judgment

This action began on December 17, 2008, when the Government filed a complaint in the United States District Court for the Southern District of New York (Holwell, *J.*) seeking the forfeiture of property belonging to Assa and Bank Melli under 18 U.S.C. § 981(a)(1). The centerpiece of this property is the Building. The Government alleged that the property was traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 *et seq.*, and to money-laundering transactions in violation of 18 U.S.C. §§ 1956 and 1957.

In November 2009, the Government amended its forfeiture complaint to add certain property interests of the Claimants, including their interests in the Building. Along with the above-noted statutes, the amended complaint relied on the Iranian Transactions Regulations ("ITRs"), promulgated by the Department of

Treasury's Office of Foreign Assets Control ("OFAC").[5] The ITRs forbid certain business activities with entities that the Government of Iran owns or otherwise controls. *See* 31 C.F.R. § 560. As relevant here, ITRs effective May 7, 1995 proscribe the knowing "exportation, reexportation, sale, or supply, directly or indirectly, from the United States, . . . of any goods, technology, or services to Iran or the Government of Iran." *Id.* § 560.204. The amended complaint alleged that Bank Melli, Assa, and Alavi are owned and controlled by the Government of Iran and that all three provided services to Iran in violation of the ITRs.

In 2013, the district court (Forrest, *J.*)[6] granted summary judgment to the Government, ordering that Assa and the Claimants forfeit most of the property interests cited in the amended complaint. *In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2013 WL 5178677, at *3 & n.14 (S.D.N.Y. Sept. 16, 2013); *see also In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2014 WL 1516328, at *1 (S.D.N.Y. Apr. 18, 2014) (ordering forfeiture of additional Claimant property

---

[5] In 1995, President Clinton issued executive orders declaring the Government of Iran a national security threat. The ITRs were promulgated pursuant to this authority. *See In re 650 Fifth Ave.*, 830 F.3d at 80 (citing Exec. Order No. 12,957, 60 Fed. Reg. 14,615 (Mar. 15, 1995); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 6, 1995)).

[6] In February 2012, the Southern District reassigned the case from Judge Holwell to Judge Forrest.

interests). Shortly thereafter, the Claimants—but not Assa—moved for final judgment as to their property interests. *See In re 650 Fifth Ave.*, 830 F.3d at 86. The district court granted this motion, enabling the Claimants to appeal. *Id.*

In 2016, we vacated the forfeiture judgment as it pertained to the Claimants. We remanded for the district court (1) to allow the Claimants to litigate their defense that the Government's action was untimely, which the court had rejected *sua sponte*, *id.* at 96–97; (2) to consider whether to suppress evidence the Government obtained pursuant to what we held was a defective search warrant, *id.* at 98–106; and (3) if the case survived these hurdles, to hold a trial on questions of material fact that we held the court improperly decided on summary judgment, *id.* at 93–95.

### C. Proceedings on Remand

On remand, the Claimants moved to compel discovery pertinent to the statute-of-limitations issue and to suppress evidence the Government obtained during its illegal December 2008 search. The district court denied both motions. It also granted a motion by the Government to preclude two former Alavi board members from testifying at trial, issued orders permitting the Government to play five videotaped depositions of former Alavi board members repeatedly invoking

their Fifth Amendment privilege against self-incrimination, and barred the Claimants from presenting certain evidence to rebut the adverse inferences suggested by the videotapes.

The jury returned a verdict for the Government. It found that almost all the Claimants' property interests cited in the amended complaint were either traceable to or derived from the proceeds of an IEEPA violation. The jury also tied most of Alavi's property to money-laundering transactions. After resolving a handful of posttrial motions, the court entered final judgment for the Government and ordered the forfeiture of most of the property interests named in the amended complaint. The Claimants timely appealed.

## DISCUSSION

This appeal raises three issues: (1) whether the district court abused its discretion by denying the Claimants' motion to compel discovery on their statute-of-limitations defense; (2) whether the court erroneously allowed the Government to rely on the good-faith and inevitable-discovery exceptions to the exclusionary rule in denying the Claimants' motion to suppress; and (3) whether the court abused its discretion in its orders concerning the former Alavi board members' Fifth Amendment invocations.

**I.     The District Court Abused Its Discretion by Denying the Claimants' Request for Discovery on Their Statute-of-Limitations Defense.**

The relevant statute of limitations requires the Government to commence a civil-forfeiture action "within five years after the time when the alleged offense was discovered." 19 U.S.C. § 1621.

### A. Relevant Background[7]

In 2016, we held that the district court erred in *sua sponte* denying the Claimants' defense that the Government's action was untimely without affording them notice or an opportunity to defend themselves. *In re 650 Fifth Ave.*, 830 F.3d at 97. We emphasized that the record on this issue was "hardly developed at all," a fact that made the court's failure to authorize briefing particularly unjust. *Id.* The record was undeveloped, we explained, because "[t]he [district court] had repeatedly denied [the] Claimants' attempts to obtain discovery that might show when the Government learned of the Claimants' alleged forfeitable offenses." *Id.*

---

[7] The opinion denying the Claimants' motion to compel is *In re 650 Fifth Avenue and Related Properties*, No. 08 Civ. 10934 (KBF), 2017 WL 775820 (S.D.N.Y. Feb. 28, 2017). The opinion granting the Government's post-remand motion for summary judgment is *In re 650 Fifth Avenue and Related Properties*, No. 08 Civ. 10934 (KBF), 2017 WL 8639806 (S.D.N.Y. May 10, 2017).

at 97 n.28. We instructed the court on remand to "afford [the] Claimants a reasonable opportunity to respond before deciding the issue against them." *Id.* at 97.

In December 2016, more than five months before trial, the Claimants moved to compel discovery in support of their statute-of-limitations defense. The district court denied the motion, holding that the Claimants had waived discovery on this issue by not seeking it during a discovery period running from 2012 through June 2013. The court acknowledged our finding that it had repeatedly denied the Claimants' discovery requests made during that period. But the district court disagreed; it asserted that it "did not deny [the Claimants'] attempts to obtain discovery regarding their statute of limitations defense[,] principally because [they] had] never made such attempts during the discovery period." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 775820, at *15. In the district court's view, ***our finding was erroneous*** because the Claimants "misrepresent[ed] the pre-appeal record and status of discovery that preceded the Second Circuit's opinion." *Id.* at *1; *see also id.* at *15 ("[The Claimants'] arguments made to the Second Circuit— and the accompanying record citations—provided a substantially incomplete (and misleading) picture of discovery in this case.").

12

## B. Analysis

We review a district court's decision denying discovery for abuse of discretion. *See In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 102 (2d Cir. 2008). "A district court abuses its discretion only when the discovery is so limited as to affect a party's substantial rights." *Id.* at 103 (citation and quotation marks omitted). The substantial right at issue here is that "[a] party must be afforded a meaningful opportunity to establish the facts necessary to support [its] claim." *Id.*

*1.* The sole basis for the district court's decision was its waiver finding. In December 2016, the Claimants sought to discover the following materials:

> 1. Records, reports, memoranda, correspondence, notes, and other documents evidencing and/or related to allegations that Claimants and/or Assa were controlled or influenced by, providing services to, or acting as a front for Iran and/or Bank Melli, directly or indirectly, contained in Government investigative files for which the investigation began on or before November 12, 2004, including but not limited to documents contained in [a series of enumerated FBI] investigative files and their related or cross-referenced files . . . .

> 2. Records, reports, memoranda, correspondence, notes, or other documents exchanged among the Government, on the one hand, and New York State or other state authorities, on the other hand, in connection with investigations of allegations that Claimants and/or Assa were controlled or influenced by, providing services to, or acting as a front for Iran and/or Bank Melli, directly or indirectly, including but not limited to documents to and from [certain state and local agencies] . . . .

13

3. Records, reports, memoranda, correspondence, notes, or other documents reflecting or relating to communications between Government agents or employees and [enumerated journalists] who authored [enumerated] articles . . . , and all documents identifying or relating to investigative steps or other efforts taken in response to [enumerated] articles or the allegations raised in them . . . .

J.A. 1216–18.[8] The Claimants argue that several of their earlier discovery requests covered the same materials.

*First*, the Claimants made a May 2011 request seeking, among other things, "[a]ll internal files, records, reports, memoranda, correspondence, notes, or other documents collected, maintained, or reviewed by the Government relating to the Claimants, Assa, Iran, and current and former employees, directors, agents, and representatives of Claimants and Assa, relating in any way to the allegations in the Complaint." *Id.* at 1240. They also sought materials relating to the ownership and management of Assa. The Claimants argue that the Government produced some, but not all, of these materials in January 2013.

*Second*, the Claimants sought to compel discovery in an April 2013 letter to the district court. The letter noted that "[t]he Government has . . . failed to make a

---

[8] Citations to the joint appendix and exhibits are to filings found on the docket for *Havlish v. 650 Fifth Avenue Co.*, No. 17-3278(L) (2d Cir. 2019).

14

complete production of documents [and particularly investigative files] from other federal agencies, including the IRS, Department of State, and OFAC," as well as the FBI's non-New York field offices. *Id.* at 846. It specifically contended that the Government had not produced the IRS's records "concerning the 1989 transaction by which the Fifth Avenue Company was formed." *Id.*

*Third*, the Claimants made several requests after the discovery period closed. On July 9, 2013, they reiterated their demand for documents maintained by the above-noted federal agencies. On August 8, they asked the district court to compel the production of documents relating to OFAC's investigations of the Claimants. On August 30, they informed the court of their "belie[f] that OFAC (and the IRS) were aware or should have been aware of [the] Claimants' alleged violations of [IEEPA] as early as the mid-1990s." *Id.* at 893. They also reemphasized their wish to learn about OFAC's involvement in the investigation, explaining that this information "directly impact[s] whether the statute of limitations has run." *Id.*

The district court dismissed the requests made during the discovery period. It framed them as "exceedingly broad and general" catchalls made for different purposes and faulted the Claimants for failing to "link[] specific categories of documents to [their] statute of limitations defense." *In re 650 Fifth Ave.*, No. 08 Civ.

10934 (KBF), 2017 WL 775820, at *4. The court also refused to credit the requests submitted after its June 2013 discovery deadline.

**2.** The district court abused its discretion by denying the Claimants' motion to compel discovery. As we held in 2016, a principal error in the court's *sua sponte* decision to reject the Claimants' statute-of-limitations defense was that the court acted on a "hardly developed" record and "without affording the Claimants any — let alone a full and fair—opportunity to present evidence as to the applicability of the defense." *In re 650 Fifth Ave.*, 830 F.3d at 97. These shortcomings are as real today as they were in 2016. Although we did not instruct the court to authorize discovery on the timeliness issue, our characterization of the "hardly developed" record left little room for denying their request. The district court's bold finding that this Court was somehow duped by the Claimants on the first appeal—without serious pushback from the Government—is unsupported by the record.

To be sure, discovery on remand would have taken time. But the parties had time. The Claimants moved to compel more than five months before the planned trial. At that point, the proceedings were already paused because our remand order left numerous pretrial issues pending before the district court. The court offered no compelling reason why the Government would have been unduly

16

prejudiced or burdened by the delay, if any, of limited discovery on the Claimants' potentially dispositive affirmative defense. Similarly, the Government's brief barely gives lip service to the notion that it would have been prejudiced or burdened.

Instead, the district court relied exclusively on a finding of waiver. The premise of this finding was not that the Claimants had never sought to discover materials relevant to the statute-of-limitations issue, but that their requests were either too broad to put the Government on notice of what they wanted or were made for different purposes. *See In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 775820, at *3–4. Neither finding stands up to scrutiny.

The Claimants' May 2011 request best illustrates the district court's error. Subject to any confidentiality rules, the Claimants were entitled to review the information that formed the basis of a complaint seeking forfeiture of their property. Had the Government provided those materials, the Claimants likely could have discerned when the statute of limitations began to run.[9] While the

---

[9] We do not decide whether the Government's production in response to this request was adequate. The district court made no finding to this effect in the order and opinion now on appeal. We simply observe that the scope of the request fairly includes documents

17

Claimants' request was broad, the district court clearly erred by deeming it so "exceedingly broad and general" to justify a finding that the Claimants never sought the materials at all. *See id.* at *4. The qualification that the documents must "relat[e] in any way to the allegations in the Complaint" adequately communicated to the Government the scope of the discovery that the Claimants had demanded. J.A. 1240.[10]

The district court also faulted the Claimants because they did not alert the Government that they wished to use this information to support their statute-of-limitations defense. But their request was clearly relevant to this defense, as it went to the basis for the Government's allegations. The Claimants were not required to disclose every use they might find for the evidence they requested. Particularly at

---

relevant to the statute-of-limitations issue, such that the court's waiver finding was clearly erroneous.

[10] The Government similarly dismisses the Claimants' request as "extraordinarily expansive." Appellee Br. 54. But some of the Government's own demands were nearly identical. Compare, for example, a protective order the Government served on the Claimants in December 2008. It required them to preserve "any documents relating in any manner or part to the allegations in the Complaint." D. Ct. Docket No. 08 Civ. 10934, ECF No. 2 (emphasis added). The Claimants' May 2011 discovery request asked for "documents collected, maintained, or reviewed by the Government . . . relating in any way to the allegations in the Complaint." J.A. 1240 (emphasis added).

the early stages of the litigation when the Claimants made some of these demands, their request for a broad array of documents relevant to many potential issues in this complex case was reasonable.[11]

* * *

The district court denied the Claimants "a meaningful opportunity to establish the facts necessary to support [their] claim." *See In re Agent Orange*, 517 F.3d at 103. We reverse the order denying the motion to compel and vacate the order granting summary judgment to the Government on the statute-of-limitations issue. On remand, the district court shall ensure that the Government fulfills its discovery obligations to the extent the law requires.

---

[11] That the Claimants' December 2016 request was framed more narrowly does not alter this conclusion. By then, their sole need for discovery was to learn information relevant to the statute-of-limitations issue that we had ordered the court to address on remand.

## II. The District Court Erroneously Denied the Claimants' Motion to Suppress Evidence Obtained Under the Defective Search Warrant.

### A. Relevant Background[12]

In 2006, the FBI's Counterterrorism Division began investigating the Claimants and Assa for possible IEEPA violations and money laundering. The investigation, led by Special Agent George Ennis, involved multiple Assistant United States Attorneys. A major focus was the relationship among Alavi, Assa, and Iran, including the formation of 650 Fifth Ave. Co. By 2008, the FBI concluded that the Government of Iran controlled Alavi and owned both Bank Melli and Assa.

On December 17, 2008, the Government filed a complaint seeking forfeiture of Assa and Bank Melli's interests in 650 Fifth Ave. Co. The complaint did not include the Claimants' interests, but that day the Government named the Claimants in a protective order requiring them to preserve documents relevant to the complaint. *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2062983, at *8.

---

[12] Unless otherwise noted, we take the following facts, which the district court found by a preponderance of the evidence, from the order and opinion denying the motion to suppress. *See In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2017 WL 2062983 (S.D.N.Y. May 15, 2017).

Also on that day, the FBI interviewed employees of Assa, Alavi, and 650 Fifth Ave. Co. at 500 Fifth Avenue in Manhattan, where all three entities shared offices. The FBI served Farshid Jahedi, Alavi's President, with a subpoena instructing Alavi to produce by December 30 "any and all documents relating or referring to" Assa, Bank Melli, and 650 Fifth Ave. Co. from 1989 to present. *Id.* at *8–9 (citation omitted). The interviewing agents, in the words of the district court, "saw a large volume of documents" in the 500 Fifth Ave. offices and learned that the basement of that building contained two hundred or more boxes of records dating back thirty years. *Id.* at *9. The agents believed these documents were relevant to the investigation.

On December 18, 2008, Ennis worked with the U.S. Attorney's Office to prepare a warrant and supporting affidavit (the "Ennis affidavit") covering these materials. Elsewhere on that day, FBI agents surveilling Jahedi observed him depositing torn documents, which the FBI later learned were responsive to the subpoena, into a public waste bin. Before Ennis learned of this fact, "the search warrant [application] was essentially complete." *Id.* at *9.

Ennis completed the warrant and application materials early on December 19. After both Ennis and a supervisor at the U.S. Attorney's Office reviewed the

warrant and the Ennis affidavit, the Government presented the warrant to a magistrate judge in the Southern District, who approved it. As we held in our 2016 decision, and as the Government conceded, the warrant was constitutionally deficient because "[o]n its face, [it] . . . plainly lacked particularity as to the crimes at issue." *See In re 650 Fifth Ave.*, 830 F.3d at 100. The warrant referenced "the supporting affidavit(s)" in "boilerplate language" in its statement of probable cause. *Id.* at 84. But the "[Ennis] affidavit was neither attached to the warrant nor incorporated by deliberate and unequivocal language." *Id.* at 101. The warrant also failed to "particularize categories of computerized information for which there was probable cause to seize, or the temporal scope of the materials that could be seized." *Id.* at 100.[13]

---

[13] The warrant covered:

> (1) "[a]ny and all . . . documents or records concerning or relating to the ownership of, rental of, mortgaging of, or investing in [Assa, 650 Fifth Ave. Co., Alavi, or Bank Melli Iran],"

> (2) "[a]ny and all documents concerning or relating to financial books and records, bank accounts, disbursements, money transfers or employment records of [Assa, 650 Fifth Ave. Co., Alavi, or Bank Melli Iran] or any of the officers and employees of these entities," and, most broadly,

> (3) "[a]ny and all computers; central processing units; external and internal drives; external and internal storage equipment or media; computerized data storage devices; hard disks or floppy disks; CD-ROMs[;] . . . and

The Government executed the warrant the day the magistrate approved it. Although the district court made no finding to this effect, no one on the search team, including the agent who led the team, appears to have reviewed the Ennis affidavit. *See* J.A. 2015, 2044. Ennis did not brief the search team or participate in the search. The FBI seized over two hundred boxes of materials and several computers. The district court did not discuss the contents of the boxes or computers, nor is this information clearly discernable from the record.

In November 2009, the Government added the Claimants' interests to the Assa forfeiture litigation by filing an amended complaint. The amended complaint relied in part on information the Government learned as a result of the unlawful search.

### B. Analysis

On appeal from an order ruling on a motion to suppress evidence, we review a district court's legal conclusions *de novo*, its factual findings for clear

---

related or connected computer or data storage equipment" located on the premises to be searched.

*Id.* (citation omitted, line breaks added).

23

error, and its decisions on mixed questions of law and fact *de novo*. *United States v. Bershchansky*, 788 F.3d 102, 108 (2d Cir. 2015).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and prohibits the issuance of warrants without "probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

We previously found the warrant deficient for its lack of particularity. *See In re 650 Fifth Ave.*, 830 F.3d at 100–01. Thus, the question here is not whether the Fourth Amendment right was violated, but whether a remedy for that wrong is required. The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). Instead, courts have crafted "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Id.*[14]

---

[14] "It is well-established that the Fourth Amendment's exclusionary rule applies in forfeiture cases." *In re 650 Fifth Ave.*, 830 F.3d at 98.

In determining whether the exclusionary rule applies, courts must consider several principles. "First, the exclusionary rule is not an individual right and applies only where it 'result[s] in appreciable deterrence.'" *Id.* at 141 (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984)). "In addition, the benefits of deterrence must outweigh the costs." *Id.* "To the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against its substantial social costs." *Id.* (brackets omitted) (quoting *Illinois v. Krull*, 480 U.S. 340, 352–53 (1987)). Accordingly, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144.

This reasoning has given rise to a number of "exceptions" to the exclusionary rule. The district court held that two of them apply here.

### 1. Good-Faith Exception

The good-faith exception recognizes that "the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct at issue." *Davis v. United States*, 564 U.S. 229, 238 (2011) (citation, brackets, and quotation marks omitted). "When the police exhibit deliberate, reckless, or grossly negligent

25

disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.* (citation, brackets, and quotation marks omitted). Conversely, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force." *Id.* (citations and quotation marks omitted). Among other scenarios, the exception applies when the government acts in "objectively reasonable reliance on a subsequently invalidated search warrant." *Leon*, 468 U.S. at 922. Exclusion's deterrent benefits fade in such cases, because "[t]he error . . . rests with the issuing magistrate, not the [government]," and "'punishing the errors of judges' is not the office of the exclusionary rule." *Davis*, 564 U.S. at 239 (quoting *Leon*, 468 U.S. at 916) (brackets omitted).

There are, however, at least four scenarios where reliance on an invalid warrant is unreasonable:

> (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)). The fourth scenario "depend[s] on the circumstances of the particular case." *Leon*, 468 U.S. at 923. It applies, for example, when a warrant "fail[s] to particularize the place to be searched or the things to be seized." *Id.* The animating concern is whether the "warrant [is] so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Id.*

That language fits this case like a glove. This warrant is facially deficient. It does not even arguably include a reference to the Claimants' alleged crimes or a temporal scope for the items to be seized. *See* Ex. 3824–25; *see also, e.g.*, *In re 650 Fifth Ave*, 830 F.3d at 100 ("On its face, the warrant . . . plainly lacked particularity as to the crimes at issue.").[15] No reasonable officer could have presumed that this glaringly deficient warrant was valid.

---

[15] In *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010), we applied the good-faith exception when officers seized evidence pursuant to a defective warrant after they failed to attach an affidavit. The Government references our warning that "[n]ot every facially deficient warrant . . . will be so defective that an officer will lack a reasonable basis for relying upon it." *Id.* at 66. But as that sentence continues, "the defective warrant in this case certainly did not have the glaring deficiencies of [those in other cases]." *Id.* The warrant here was glaringly deficient.

The Ennis affidavit might have cured at least some of the warrant's defects. But as we found in 2016, the Ennis affidavit was "neither attached to the warrant nor incorporated by deliberate and unequivocal language." *In re 650 Fifth Ave.*, 830 F.3d at 101. And there is no evidence that anyone on the search team reviewed the Ennis affidavit before the search or heard from Ennis during the operations briefing.

The district court excused this problem by finding in general terms that the search team leader and some members of her team were familiar with the FBI's investigation into the Claimants. In effect, the court found that the warrant's glaring defects were of no moment because "the agents on site here knew what they were looking for and, importantly, why." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2062983, at *23 n.34.

This finding is both clearly erroneous and irrelevant. Ennis prepared the affidavit on December 18, the day before the search. Even if some members of the search team were familiar with the investigation, they were not familiar with the contents of the affidavit. General notions of the targeted property and alleged crimes are not a substitute for a warrant demonstrating that a judge authorized the seizure of particular items for particular reasons.

The court also clearly erred in finding that "the need for expeditiousness" following the FBI's discovery that Jahedi had destroyed documents "was the primary reason the search warrant was likely not identified as deficient." *Id.* at *10. The finding is plainly inapplicable to Ennis, as the court found that "[b]efore Ennis learned of the destruction of documents, the search warrant was essentially complete." *Id.* at *9. In fact, the Ennis affidavit makes no mention of the destruction of documents.

Nor does the record support the district court's expediency finding with respect to the other agents and attorneys who reviewed and executed the warrant. If anything, the record suggests that the Government did *not* rush through these processes. As numerous FBI agents and AUSAs testified, and the district court found, "[t]he evidence does not support any material deviation from typical procedures." *Id.* at *29.[16] For example, the court found that "[t]ypically, and as occurred here," Ennis reviewed the materials to "ensure accuracy" and then sent

---

[16] *See also, e.g., id.* at *10 ("[T]he conduct here did not deviate in any material way from reasonable, typical practice" for obtaining search warrants at the FBI's New York office.); *id.* at *29 ("[T]he . . . facts make clear that the procedures used to execute the warrant were entirely typical . . . ."); *id.* at *31 ("[T]he U.S. Attorney's Office and FBI used routine procedures in connection with a very large investigation.").

them to a supervising AUSA, who reviewed and approved the application. *Id.* at *10. Similarly, the agent who led the search team reviewed the warrant before executing the search and testified that it "did not appear unusual to her—or different from other search warrants she had been involved in executing." *Id.* at *16. Some fault may lie with the magistrate for failing to ensure that the Ennis affidavit was attached to the warrant. (The magistrate's involvement is not clear from the record.) But the lion's share of the blame lies with the Government for neglecting to catch these errors or executing the warrant in spite of them.

Under all these circumstances, the Government's reliance on this warrant was not "objectively reasonable." *See Leon*, 468 U.S. at 922. To the contrary, the fact that these glaring deficiencies survived the Government's typical process for drafting, reviewing, and executing warrants indicates "grossly negligent disregard for Fourth Amendment rights." *See Davis*, 564 U.S. at 238 (quotation marks omitted). In the presence of gross negligence, "the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Id.*

Applying the exclusionary rule on these facts would advance its deterrent rationale. The Government drafted an exceptionally broad and facially defective warrant, multiple trained officers and attorneys failed to address this problem, and

a team without particularized knowledge of the proper scope of the search seized over two hundred boxes of evidence and several computers. Prohibiting the Government from reaping the spoils of its deficient procedures would deter it from making the same mistakes in the future.

The cost to the Government of improving its review process would be minimal. A simple checklist could have solved the failures to incorporate a supporting affidavit and identify the alleged crimes. The Fourth Amendment protection would mean little if officers acting under facially deficient warrants were free to ransack troves of private property without clear ground rules laid down by a judge.

The Government may not rely on the good-faith exception.

### 2. Inevitable-Discovery Exception

The inevitable-discovery exception allows the Government to rely on unlawfully seized evidence if it can prove that it would have inevitably obtained the evidence absent the constitutional violation. *In re 650 Fifth Ave.*, 830 F.3d at 102. District courts applying the exception must "determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Id.* (quoting *United States v. Eng*, 971 F.2d 854,

861 (2d Cir. 1992)). "[P]roof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment . . . ." *Id.* (quoting *Eng*, 971 F.2d at 859). The Government's burden is to "prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." *Id.* (quoting *United States v. Vilar*, 729 F.3d 62, 84 (2d Cir. 2013)).

> Courts resolve claims of inevitable-discovery under a two-step process.
>
> First, the court must evaluate the progress of the investigation at the time of the government misconduct to determine whether an active and ongoing investigation was in progress at [that time]. At this step, the government must establish that the investigation was not triggered or catalyzed by the information unlawfully gained by the illegal search but, rather, that the alternate means of obtaining the challenged evidence was, at least to some degree, imminent, if yet unrealized at the time of the unlawful search.
>
> Second, the court must, *for each particular piece of evidence*, specifically analyze and explain how, if at all, discovery of that piece of evidence would have been more likely than not inevitable absent the unlawful search.

*Id.* at 103 (cleaned up, emphasis in original).

Prior to the first appeal, the district court made cursory findings that the Government would have obtained the massive volume of unlawfully seized evidence through civil discovery and the protective order. *Id.* We vacated that decision on appeal, holding that it was insufficient under the standard articulated above. *Id.* at 103–04. Our opinion carefully explained that, on remand, "the Government must make a detailed showing of each of the contingencies involved and the [district court] must find each contingency satisfied with respect to each item of seized evidence." *Id.* at 106 (citation, quotation marks, and brackets omitted).

The district court did not follow our instructions. Its opinion does not list or even summarize the contents of the over two hundred boxes of documents and several computers at issue. Nor does it explain how the Government would have discovered "*each particular piece of evidence . . .* absent the [unlawful] search." *Id.* at 103 (emphasis in original). What sweeping findings the court did provide are either inadequate or unsupported by the record.

*First*, the court found that "[t]he facts developed in detail at the evidentiary hearing allow this [c]ourt to easily conclude that prior to the search, a majority of the facts that were later included in the [amended] complaint . . . had already been

33

developed." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2062983, at *32. The court did not explain what these facts were or why they allowed it to draw this conclusion. Its observations "that the investigation was very active" and involved "a number of interviews occurring prior to the search," *id.*, are no basis for concluding that the Government would have inevitably learned these facts.

Moreover, the district court's findings do not support its conclusion that "a substantial number of the allegations in the [a]mended [c]omplaint referenced documents that the Government possessed [prior to the search]." *See id.* at *20. Because the amended complaint cited some lawfully obtained materials, the court apparently reasoned that it could ignore the fact that the amended complaint also relied on unlawfully obtained materials. But the court did not identify these materials, categorize them, or explain their importance to the amended complaint. In fact, the court appears to have based its finding that the lawfully obtained evidence was sufficient on little more than the assertions of the Government's witnesses. *See id.* at 19–20. The court's most substantial discussion of the amended complaint was a "see, e.g." citation to a smattering of paragraphs from that document—examples taken wholesale from the suppression-hearing testimony of Special Agent Ennis, *see* J.A. 1713–30—asserting without further discussion that

the Government already possessed the unspecified information contained within them.[17] These scattered stars offer no basis for charting the constellation of facts that shaped the Government's case.

*Second*, the district court found that the December 17 subpoena served on Jahedi "materially covers the relevant documents." *Id.* at *9. This is clearly erroneous. The subpoena covered "any and all documents relating or referring to [Assa], Bank Melli . . . , and 650 Fifth Ave. Co. from January 1, 1989 to the present." *Id.* (citation and quotation marks omitted). By contrast, the warrant lacked any

---

[17] *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2062983, at *20 ("[A] substantial number of the allegations in the Amended Complaint referenced documents that the Government possessed when it seized Assa's accounts and filed the [original complaint]. (*See, e.g.*, GX 9 ¶¶ 28 (from a search of the Bank Melli president's residence prior to December 2008); 32 (received from a confidential source before December 2008); 33 (also received from the confidential source prior to December 2008); 34 (same); 35 (same); 36 (same); 37 (same); 38 (same); 39 (same); 40 (from a search of the Bank Melli Iran's president's residence prior to December 2008); 43–46 (based on documents also received before December 2008); 50 (from the confidential source before December 2008); 52 (same); 54 (same); 56 (same); 57 (same); 58 (same); 60 (same); 63 (same); 64 (learned from Rahi during an interview before December 2008); 77 (from surveillance before December 2008); 81 (learned from Geramian before December 2008); 82 (from a search of the Bank Melli Iran's president's residence before December 2008); 83–88 (same); 89–90 (learned from an interview of Geramian that occurred before December 2008); 96 (from a search of the Bank Melli Iran's president's residence before December 2008); *see generally* Tr. 113:9–130:11 (Ennis).").

temporal limitation, meaning it included documents created prior to 1989.[18] Also

unlike the subpoena, the warrant covered "[a]ny and all documents concerning or

relating to financial books and records, bank accounts, disbursements, money

transfers or employment records of [Alavi]," as well as "[a]ny and all computers"

and similar electronic storage devices. *Id.* at *12.

*Third*, the district court found that "there has been extensive sharing of

documents and coordination between the Government" and judgment creditors

in related cases, and that the Claimants disclosed unspecified "documents at

issue" to the judgment creditors. *Id.* at *33. Without further analysis, the court

concluded that "[t]here is simply no significant possibility that such documents

would not have made their way to the Government." *Id.* Even if we construe this

finding as applying to *all* the evidence obtained under the warrant, it is clearly

erroneous and contrary to the law of the case. As we held in 2016 in response to

the same finding:

> The Government . . . sought [the] documents [named in this joint
> discovery request between the Government and judgment creditors]
> from Alavi and 650 Fifth Ave. Co. only after amending its complaint
> to seek forfeiture of their interests. Many of the amended complaint's

---

[18] According to the FBI, some of the documents it seized went back significantly further than 1989. *See id.* (noting the materials went back three decades).

allegations against Alavi and 650 Fifth Ave. Co. derived from documents seized during the December 19, 2008 search. *On this record, we cannot confidently conclude that a request for production in the amended forfeiture action was not tainted by the challenged search so as to admit a finding of inevitable discovery.*

*In re 650 Fifth Ave.*, 830 F.3d at 105 (emphasis added).

*Fourth*, the court found that "[j]oining Alavi's interest in the litigation would have allowed the U.S. Attorney's Office to have used civil discovery devices. This Court has a factually based, high level of confidence that this would have occurred." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2062983, at *32. As above, this is improper speculation. "[P]roof of inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment . . . ." *In re 650 Fifth Ave.* 830 F.3d at 102 (quoting *Eng*, 971 F.2d at 859).

One contingency the court did address was whether the Claimants would have destroyed the materials. It found "with near certainty" that they would not have done so because "multiple individuals" in the Government were monitoring "every move regarding [the] documents" and the protective order "required compliance with preservation obligations." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2062983, at *32–33. While the protective order was broad, these

nebulous findings prevent us from understanding the basis for the court's conclusion or sharing its confidence that the order required the preservation of "the very same records seized" under the warrant. *See id.* at *8. Moreover, without factoring in the possible contingencies, simply identifying the intersection between the protective order and the seized materials does not solve for inevitable discovery. As we already held, the "[protective] order imposed no production obligation on Alavi" or 650 Fifth Ave. Co. *In re 650 Fifth Ave.*, 830 F.3d at 104.

* * *

We recognize that our inevitable-discovery standard imposes a significant burden on district courts. Sorting through the 200 boxes of evidence and other materials the Government illegally obtained will be no easy task. But allowing district courts to pardon unlawful searches by simply declaring "inevitable discovery" would undermine the rationales behind the exclusionary rule. Our well-established principle that courts must make findings "for each particular piece of evidence," *Eng*, 971 F.2d at 862, ensures that the inevitable-discovery exception does not swallow the exclusionary rule.

In sum, and for the second time, we vacate the district court's inevitable-discovery holding for legal error. Because the unlawfully obtained evidence goes

to the heart of the Government's case and informed the amended complaint, this

error was not harmless. We therefore vacate the trial judgment.[19]

**III.  The District Court Abused Its Discretion by Precluding Testimony from Two Former Alavi Board Members, Allowing the Government to Play Videotaped Fifth Amendment Invocations from Several Former Board Members, and Precluding the Claimants' Rebuttal Evidence.**

### A. Relevant Background[20]

Numerous former Alavi board members invoked their Fifth Amendment

right against self-incrimination in response to dozens of deposition questions. The

depositions were captured on videotape. Leading up to the planned 2013 trial, the

Claimants argued that the Government intimidated the witnesses into invoking

the privilege by, among other things, falsely implying that they had criminal

---

[19] We have clearly articulated the standard for considering whether the inevitable-discovery exception applies. If on remand the district court finds this standard has not been met, it must suppress the evidence.

[20] Unless otherwise noted, we take the following facts, which the district court found by a preponderance of the evidence, from three memorandum orders addressing the underlying issues. *See In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869 (S.D.N.Y. May 18, 2017); *In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2017 WL 6419035 (S.D.N.Y. May 30, 2017); *In re 650 Fifth Ave. & Related Props.*, No. 08 Civ. 10934 (KBF), 2017 WL 6729444 (S.D.N.Y. June 14, 2017).

exposure. They thereby sought to prevent the Government from playing the videotapes of these depositions at trial.

But the planned trial never occurred; the court granted summary judgment to the Government. We reversed that decision in July 2016. In November 2016—more than six months before the trial underlying this appeal—the following exchange took place between counsel for the Claimants and the district court:

> MR. RUZUMNA: Also, your Honor, there were a number of individuals who asserted their Fifth Amendment right not to testify and not to incriminate themselves and refused to be deposed. We understand that at least some, if not all, of them have decided that they would be willing to testify, and I expect that the government, if we intend to call them, would certainly want an opportunity to depose those individuals.

> THE COURT: And that could raise a variety of issues, one of which the government could say it's too late.

J.A. 1204. The Government did not seek depositions. Then on March 7, 2017—over two and a half months before trial—the Claimants informed the Government that they planned to call two former board members at trial: Hassan Hassani and Ali Dabiran. They also offered the Government the opportunity to depose both witnesses prior to trial.

The Government moved to preclude this testimony. The district court granted its motion, finding that the proposal to call the witnesses was "really a unilateral reopening of fact discovery." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *4 & n.12. The court observed that "[t]his case was days away from trial in 2013," up to which point the Claimants had not made the witnesses available to testify. *Id.* Thus, in the court's view, "reopening discovery" in this way would "prejudice the Government and [the judgment creditors in a coordinated action]." *Id.* at *4.

At the same time, the Claimants moved to preclude the Government from introducing the privilege invocations as evidence; the Government cross-moved for permission to call the former board members and receive an adverse jury instruction. The Claimants again argued that the Government had intimidated the witnesses into staying silent. They pointed to certain statements and documents in their possession in 2013, including emails suggesting the FBI's belief that everyone at Alavi was guilty of a crime. They flagged, among other things, the following:

- In a December 2008 email, one FBI agent told other agents that their planned interviews with Alavi employees "will be 99% pitch, no wrangling over details or listening to denials. The pitch is pretty simple: . . . if you're not on

board . . . we'll lock you up." J.A. 2534.1. The agent also stated that "[o]ur goal is to hit everyone at once, destabilize the situation at our main target (Alavi Foundation), and produce some [cooperating witnesses]." *Id.*

- In a May 2011 conference, the Government took "the position that the statute of limitations [for IEEPA and money laundering violations] won't run with respect to the Alavi Foundation until November of 2014." *Id.* at 455. The inference the Claimants drew was that, at the time of the depositions, the Government could criminally charge the board members.

Without discussing this evidence, the district court rejected the Claimants' intimidation theory. It found that the Claimants "cherry pick[ed] comments taken out of context" and that "[t]here [was] not a shred of evidence that suggest[ed] that the agents engaged in any unusual or coercive tactics here." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *5. The court later explained that, although the Government did not ultimately charge the former board members with crimes, they had possible criminal exposure at the time of their depositions.

The court then held that the invocations were relevant under Rule 401 of the Federal Rules of Evidence and admissible under Rule 403. In a subsequent order, it held that the Government could play the videotapes at trial. It also authorized the Government to offer its questions of the witnesses as an exhibit. It promised to issue a limiting instruction explaining that the questions are not evidence and that

the jurors may, but need not, draw an adverse inference from the witnesses' decisions not to testify.

The court allowed the Claimants to "argue that the jury should give little to no weight to [the adverse] inference." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 6419035, at *4. However, it barred them from introducing "testimony by FBI agents and exhibits related to the criminal investigation" supporting their theory that the Government intimidated the witnesses. *Id.* at *5. In the same vein, it precluded them from presenting "testimony by counsel for multiple individual witnesses related to their communications with the Government about the criminal investigation." *Id.* It found this evidence would be irrelevant under Rule 401, and impermissible under Rule 403, because "it would be misleading and confusing to the jury to suggest that the criminal investigation was not serious and did not carry real exposure for [the] Claimants or the witnesses." *Id.*[21]

### B. Analysis

The Claimants argue that the district court abused its discretion by (1) forbidding Hassani and Dabiran from testifying, (2) allowing the Government to

---

[21] The court returned to the issue once more in a June 14, 2017 memorandum order declining the Claimants' request for additional jury instructions.

play the videotapes, and (3) precluding certain evidence the Claimants wished to present in rebuttal to the videotapes.[22] We agree, and each of these errors provides an independent reason for vacating the judgment.

### 1. The District Court Abused Its Discretion by Precluding the Witnesses from Testifying.

We review a district court's decision to admit or exclude evidence for abuse of discretion. *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010). In general, a district court should take a liberal view toward applications by civil litigants[23] to withdraw their previously invoked Fifth Amendment privilege. *See United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn, N.Y.*, 55 F.3d 78, 84 (2d Cir. 1995). "[I]f there is a timely request made to the court, the court should explore all possible measures in order to select [a] means [that] strikes a fair balance and accommodates both parties." *Id.* (citation, quotation marks, and alterations omitted). "In doing this, it should give due consideration

---

[22] The Claimants also ask us to sanction the Government for its purported coercive tactics. We decline to do so.

[23] The district court found that as former board members, Hassani and Dabiran were "sufficiently close [to Alavi] to be analogous to . . . a litigant" under the precedent we discuss. *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *5. As the parties do not challenge this finding, we assume without deciding that it is correct.

to the nature of the proceeding, how and when the privilege was invoked, and the potential for harm or prejudice to opposing parties." *Id.* "The court should be especially inclined to permit withdrawal of the privilege if there are no grounds for believing that opposing parties suffered undue prejudice . . . ." *Id.*

This does not mean that courts must always allow litigants who invoked the privilege to testify. "Since an assertion of the Fifth Amendment is an effective way to hinder discovery and provides a convenient method for obstructing a proceeding, trial courts must be especially alert to the danger that the litigant might have invoked the privilege primarily to abuse, manipulate or gain an unfair strategic advantage over opposing parties." *Id.* "In such circumstances, particularly if the litigant's request to waive comes only at the 'eleventh hour' and appears to be part of a manipulative, 'cat-and-mouse approach' to the litigation, a trial court may be fully entitled, for example, to bar a litigant from testifying later about matters previously hidden from discovery through an invocation of the privilege." *Id.* at 85. How to decide whether a litigant has abused the privilege falls within the discretion of the district court. "[A]s long as [the court] considers the relevant factors and acts with moderation to accommodate both a litigant's valid Fifth Amendment interests and the opposing parties' needs in having the litigation

conducted fairly, we will not disturb the measures used by [the] court in the exercise of its discretion." *Id.*

The district court abused its discretion by precluding the testimony of Hassani and Dabiran. The court made no attempt to "explore all possible measures" for accommodating both parties, even when the Claimants notified it more than six months prior to trial—hardly the "eleventh hour"—that they intended to call witnesses who had previously invoked the privilege.[24] The court's analysis turned largely on a single factor: that the request came too late and thereby prejudiced the Government. This limited analysis was a failure to "give due consideration to the nature of the proceeding, how and when the privilege was invoked, and the potential for harm or prejudice to opposing parties." *See 4003-4005 5th Ave.*, 55 F.3d at 84.

---

[24] The court found that during an undated "very limited reopening of discovery" following remand, "[t]he parties did not raise depositions of these two witnesses with the [c]ourt." *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *4. It thus rejected the Claimants' challenge "that the Government could have taken the witnesses' depositions [after their follow-up notice in March 2017]." *Id.* To the extent the court failed to consider the Claimants' November 2016 statements in open court informing it that they intended to call the witnesses, this finding is clearly erroneous.

The court's prejudice finding is difficult to understand. Its premise is that the "case was days away from trial in 2013," at which time the Claimants were content to allow Hassani and Dabiran to sit on the sidelines. *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *4 n.12. We find it hard to see how the Government in 2017 would be unfairly prejudiced because it did not have the benefit of depositions before a 2013 trial that never occurred. After the proceedings had been paused for years awaiting the outcome of the first appeal, the Claimants gave the Government more than six months to depose a small group of witnesses. It chose not to.[25]

The court's error prejudiced the Claimants. One of the key issues at trial was whether Alavi knew about Assa's Iranian ownership after 1995. As the district court found, "[b]oth Hassani and Dabiran were high ranking personnel at the relevant period of time." *Id.* at *5. Their ability to testify about this issue could have been powerful evidence of Alavi's knowledge. Without their testimony, the jury

---

[25] We also find clear error in the court's decision to rely on "the backdrop of what are now a number of separate attempts . . . to reopen discovery." *Id.* Even if expressing an intention to call witnesses were a reopening of discovery, the court's findings about other discovery requests would have no bearing on the merits of this request. Moreover, one of these discovery requests was more meritorious than the court believed. *See* Part I, *supra*.

was left to draw adverse inferences from Dabiran's absence and Hassani's videotaped Fifth Amendment invocation.

We reverse the court's order precluding these witnesses from testifying.

### 2. The District Court Abused Its Discretion by Allowing the Government to Play the Videotaped Depositions.

"We review for abuse of discretion the district court's admission into evidence of a witness's invocation of the Fifth Amendment . . . ." *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 170 (2d Cir. 2017). A witness's Fifth Amendment invocation may be admissible evidence at a civil trial, and courts may instruct juries that they can draw an adverse inference from the invocation. *See, e.g., Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir. 1983). As is generally true of proffered evidence, the admissibility of a nonparty's privilege invocation is governed by Rules 401 and 403 of the Federal Rules of Evidence. *See id*. Rule 401 requires only that the evidence makes a consequential fact more or less probable. *See* Fed. R. Evid. 401. Under Rule 403, courts may exclude evidence when, among other things, "its probative value is substantially outweighed by a danger of . . . unfair prejudice, . . . misleading the jury, . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. While this analysis is case specific, the mere fact that

a Fifth Amendment invocation is "damning" to a party's position does not preclude its introduction. *See Brink's*, 717 F.3d at 710. However, invocations that cross the line to "inflammatory" are more likely to fail under Rule 403. *See id.*

There are two issues here. The first is a question of *content*: whether the court erroneously allowed the Government to introduce the fact that the witnesses had invoked the privilege. The second is a question of *form*: whether the court erred by allowing the Government to play the five videotapes at length, as opposed to limiting it to a less dramatic presentation.

*i.* On the question of *content*, we find no error in the court's decision to allow the Government to introduce the fact that witnesses had invoked the Fifth Amendment.[26] Subject to Rules 401 and 403, evidence of a Fifth Amendment invocation can be admissible in civil trials. The invocations here are relevant because the fact that several former Alavi board members refused to testify makes it more probable that their testimony would have harmed the Claimants' interests. If a jury chooses to draw this inference, the evidence could be significantly

---

[26] For the reasons explained in section III.B.1, *supra*, we find on separate grounds that the court should not have allowed the Government to play the videotaped deposition of a witness who later asked to testify.

probative of the Claimants' possible wrongdoing. While a jury might find that the content of the invocations is damning, the Claimants have offered no compelling reason that it would be so inflammatory to fail under Rule 403. *See id.*

Thus, if this case is retried, the Government may introduce the fact of the Fifth Amendment invocations into evidence.

***ii.*** We must also consider whether the *form* of the Government's presentation complied with our evidentiary rules. Under these circumstances, we find that the Government's dramatic presentation tipped the Rule 403 scale from "damning" to "inflammatory." *See id.*

Litigants are generally entitled to present their evidence in the form of their choosing. But this principle has limits, including Rule 403. *See Old Chief v. United States*, 519 U.S. 172, 184–85 (1997). In assessing admissibility under Rule 403, a piece of evidence's probative value to be weighed against its risk of unfair prejudice "may be calculated by comparing evidentiary alternatives." *Id.* at 184.

The district court allowed the Government to play five videotapes of nontestifying individuals declining to answer question after question during their depositions. This parade of videotapes, which the Government strategically spread out across multiple days of trial, was substantially more prejudicial and

redundant than probative. The videotapes repeatedly reminded the jury of the witnesses' decisions not to testify. And they repeatedly put the Government's incriminating questions in the jurors' minds—questions the parties agreed were not evidence and that the court allowed the Government to submit as an exhibit. Substantially less prejudicial and redundant alternatives were available, such as a stipulation or a scaled-back showing of the videotapes. Authorizing this presentation despite these serious risks was not a harmless error.

While the Government is entitled to submit the Fifth Amendment invocations into evidence, the district court's failure to moderate the Government's extreme tactic was an abuse of discretion. On remand, the court shall ensure that the Government presents its evidence in accordance with Rule 403.

### 3. The District Court Abused Its Discretion by Precluding the Claimants' Rebuttal Evidence.

Finally, we hold that the district abused its discretion by precluding the Claimants from arguing that the Government coerced the former Alavi board members into invoking the privilege.

Evidence demonstrating that the witnesses were intimidated easily satisfies Rule 401's relevance standard. Whether the witnesses stayed silent because they were culpable was a consequential fact. The Claimants' rebuttal would have made this fact less likely by suggesting that the witnesses declined to testify for a different reason: allegedly improper threats of criminal charges. The evidence cited above belies the court's finding that "[t]here is not a shred of evidence" to support this theory. *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *5; *see also e.g.*, J.A. 2534.1 (FBI agents noting in internal emails that the FBI's witness interviews during its search "will be 99% pitch" and that the pitch was "if you're not on board . . . we'll lock you up").

On Rule 403, the district court's only arguable finding of prejudice to the Government was a conclusion that the rebuttal evidence would be inflammatory. *See In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *5–6; *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 6419035, at *5. The court did not detail the content of any of the proposed evidence, except by noting in a parenthetical that one statement was an internal FBI email including the phrase "we'll lock you up." *See In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 2214869, at *5. We

are thus unable to understand how the court balanced the risk of prejudice against the probative value of the evidence as Rule 403 required it to do.

The court also found that the Claimants' intimidation theory ran the risk of misleading and confusing the jury in violation of Rule 403. But its sole basis for this conclusion was that there was not "a shred of evidence" in the Claimants' favor. *In re 650 Fifth Ave.*, No. 08 Civ. 10934 (KBF), 2017 WL 6419035, at *5. As noted above, that finding was clearly erroneous.

How the Claimants' rebuttal evidence ultimately fares under Rules 401 and 403 may turn on the district court's resolution of other evidentiary matters we have left open on remand. In particular, the Claimants' need for this evidence may depend on the form in which the Government presents the Fifth Amendment invocations. Thus, we vacate the orders precluding the rebuttal evidence and remand for the court to reconsider the evidence's admissibility alongside the remaining evidentiary issues.

## CONCLUSION

This appeal arises from a complex and hard-fought litigation. This case is one piece of several coordinated proceedings in which the Government and hundreds of judgment creditors have asserted interests in the Claimants' and

Assa's property. For many years, these cases have required the district court to decide numerous, difficult questions of law while supervising hundreds of litigants and their attorneys. This has been no easy task, and we are not blind to the challenges district courts face in managing tough cases. But the records underlying this appeal and several others we decide today reveal a troubling pattern of errors on relatively straightforward issues.[27]

If this case returns to trial, a properly informed jury may or may not find for the Government—a topic on which we have no opinion. But getting to any outcome requires a fair and procedurally adequate process, something that has been lacking in this case. There are no shortcuts in the rule of law.

\* \* \*

*1.* We **REVERSE** the district court's order denying the Claimants' motion for discovery on the statute-of-limitations defense and **VACATE** its order granting summary judgment to the Government on the merits of the issue. On remand, the court shall grant the Claimants' motion to compel discovery and ensure the Government's reasonable compliance.

---

[27] *See United States v. Assa Co. Ltd.*, No. 17-3658 (2d Cir. 2019); *Havlish v. 650 Fifth Ave. Co.*, No. 17-3278 (2d Cir. 2019).

**2.** We **REVERSE** in part and **VACATE** in part the court's order denying the motion to suppress evidence obtained from 500 Fifth Avenue on December 19, 2008. We reverse with respect to the holding that the Government can rely on the good-faith exception to the exclusionary rule. However, we vacate with respect to the inevitable-discovery holding. On remand, the court shall require the Government to submit a chart or similar exhibit documenting how it would have obtained *each particular piece of evidence* that the Claimants challenge. At minimum, this must include materials that informed the drafting of the amended complaint, as well as materials the Government has already used in this proceeding or intends to use at trial. If the Government fails to make this showing with respect to some or all of the evidence, the court must apply the exclusionary rule and, mindful that the Government relied on these materials in drafting the amended complaint, consider all other appropriate remedies.[28]

**3.** We **REVERSE** the district court's order precluding Hassani and Dabiran from testifying. If this case returns to trial, the court shall permit the Claimants to

---

[28] As we reverse the court's finding on the good-faith exception, and the Government has not argued here that any other exception applies, the only exception the court may consider on remand is inevitable discovery.

call them as witnesses.[29] We also **VACATE** the orders authorizing the Government's presentation of the videotaped depositions of former Alavi board members. While the Government may introduce the fact of the Fifth Amendment invocations into evidence, it may not repeat the unfairly prejudicial and redundant presentation from the previous trial. We leave it to the district court to decide exactly what form the evidence may take. Lastly, we **VACATE** the orders barring the Claimants from arguing that the Government intimidated the witnesses into staying silent.

*4.* The remaining issues raised by the parties are **MOOT** as a result of these holdings.

*5.* In light of these holdings, we **VACATE** the judgment.

---

[29] If the Government wishes to depose Hassani and Dabiran before trial, the court shall ensure that the Claimants make them available.